FILED'10 MAR 01 12:52USDC-ORP

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

UNITED STATES OF AMERICA,

Plaintiff/Respondent,

v.

JAY W. WILSON,

Defendant/Petitioner.

CR 01-263-3-HA
CV 06-527-HA

OPINION AND ORDER

REDDEN, Judge:

Before the court is petitioner Jay W. Wilson's Motion (doc. 285) to Vacate, Set Aside, or

Correct Sentence Pursuant to 28 U.S.C. § 2255. For the reasons set forth below, I GRANT the

motion, and ORDER the government to release petitioner within 30 days.

### I. Background

Petitioner's conviction arose from a conspiracy involving the importation and distribution

of thousands of pills of methylenedioxymethamphetamine (ecstacy). On August 13, 2001, law

enforcement officers arrested petitioner and searched his home and car pursuant to a warrant.

PAGE 1 - OPINION AND ORDER

They found 116 ecstacy pills in his briefcase, a pistol-grip shotgun under his bed, a scale, and

drug packaging materials. That same day, petitioner confessed his involvement in smuggling

more than a hundred thousand ecstacy pills, and sought to negotiate benefits for his cooperation.

For approximately three weeks, petitioner assisted the agents in seizing additional ecstacy

packages, recording phone calls to and from co-defendant Terrance Fischer, and helping agents

locate Fischer in Amsterdam.

Petitioner insisted on speaking to the prosecutor about obtaining a "deal" in exchange for

his cooperation. Assistant United States Attorney ("AUSA") Charles Stuckey informed him that

would not discuss plea negotiations unless petitioner obtained an attorney. Tr. 85:19-20 [1]; First

Aff. of AUSA Stuckey, ¶ 5. On August 29, 2009, the AUSA called the Criminal Justice Act

Panel Administrator to facilitate the appointment of counsel. Def.'s Exh. 203. Judge Jelderks

signed an order appointing Frank de la Puente ("De la Puente") to "defend [petitioner] in

connection with the [alleged] drug trafficking crimes." Gov.'s Am. Ex. 1.

On August 30, 2001, petitioner and De la Puente met with the AUSA to discuss a pre-

indictment resolution of the case. The AUSA told petitioner that he was "obviously involved in

this conspiracy," Tr. 87:8-9, and that he would "ultimately be indicted." Tr. 87:19-20; see also

First Aff. of Stuckey, at ¶ 6 ("It was made clear to [petitioner] . . . that his criminal conduct

would result in serious charges and his participation in the conspiracy would undoubtedly expose

him to a lengthy sentence."). He then offered petitioner a pre-indictment plea bargain of six

years incarceration in exchange for his continued cooperation. The AUSA refused De la

Puente's request for discovery, and set a one day deadline on the six-year offer. De la Puente

---

[1]"Tr." refers to the December 18, 2009 Transcript of Proceedings.

PAGE 2 - OPINION AND ORDER

told petitioner that he could not advise him to accept the offer without obtaining discovery. Aff. of F. de la Puente, ¶ 6; First Aff. of Wilson, ¶ 7.

The next morning, petitioner met with De la Puente to discuss the plea offer and petitioner's case. Petitioner told De la Puente that he had handled "huge amounts" of ecstacy for friends, Tr. 14:10-11, and that he had confessed to handling one hundred thousand of pills of ecstacy. Tr. 70:18-21. Petitioner also told De la Puente that he believed he had an immunity agreement with the agents. Tr. 18:6-7. Petitioner again sought the advice of his attorney as to the six-year plea offer, but De la Puente again stated that he could not give petitioner an opinion without discovery. Aff. of F. de la Puente, ¶ 6; First Aff. of Wilson, ¶ 7. De la Puente did indicate that it sounded like the agents did promise petitioner immunity. Tr. 25:1-17.

De la Puente drafted a counter-proposal, in which petitioner offered to provide information about the location of drug trafficking proceeds and would continue cooperating, in exchange for full immunity. Gov. Am. Ex. 1. The AUSA rejected any pre-indictment resolution of the case involving full immunity. Gov. Am. Ex. 2. Without communicating the substance of the AUSA's response to petitioner, De la Puente replied to the AUSA, "[y]ou correctly read my letter of this morning as a rejection" of the six-year offer. Gov. Am. Ex. 3.

On September 7, 2001, the government filed a Superseding Indictment charging petitioner with conspiracy to import, distribute, and possess approximately 100,000 pills of ecstacy with intent to distribute. The Indictment also charged petitioner with eight counts of importation, distribution, and possession of ecstacy.

The AUSA did not re-extend the six-year plea offer. On the eve of trial, he offered petitioner a plea bargain that would have resulted in 188 to 235 months imprisonment. That

PAGE 3 - OPINION AND ORDER

offer expired, unaccepted.[2]  Through pre-trial motion, and throughout trial, sentencing, and

appeal, petitioner argued that he was entitled to immunity based on his cooperation with federal

agents.  Those arguments failed, and on August 27, 2002, a jury found petitioner guilty of

multiple counts of conspiracy to import, distribute, and possess ecstacy.  On February 19, 2003,

Judge Helen Frye sentenced petitioner to 240 months imprisonment.  The Ninth Circuit affirmed

the conviction and sentence.  United States v. Wilson, 392 F.3d 1055 (9th Cir. 2004).

Petitioner timely filed the present Motion to Vacate, Set Aside, or Correct Sentence

Pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel.  Petitioner argued that

De la Puente failed to provide adequate legal advice concerning the government's initial six-year

offer, and then provided inaccurate advice regarding petitioner's potential sentencing exposure.

On April 16, 2009, Judge Ancer Haggerty issued an Opinion and Order finding that trial

counsel's grossly inaccurate advice regarding petitioner's potential sentence deprived petitioner

of constitutionally sufficient assistance of counsel during the plea bargaining process.  United

States v. Wilson, No. CR 01-263-HA, 2009 WL 1028088, at *7-8 (D. Or. Apr. 16, 2009).  He

ordered the parties to file supplemental briefs addressing: (1) whether petitioner would have

accepted a plea offer if he had been provided with adequate information regarding his likely

sentence; (2) what plea offers were made to petitioner; and (3) the proper remedy if the court

were to conclude that petitioner satisfied the second Strickland prong.  Id. at *8-9.[3]  On December

---

[2]The parties dispute whether De la Puente communicated the government's final, eve-of-
trial plea offer to petitioner.  Because I find that De la Puente's grossly inadequate advice
deprived petitioner of the ability to make an intelligent decision about whether to accept the six-
year offer, I need not decide whether he informed petitioner of the government's final offer.

[3]The parties agree that the government extended only two formal plea offers to petitioner:
(1) on August 30, 2001, the AUSA offered six years imprisonment if petitioner plead guilty and

18, 2009, the court held oral argument, and heard testimony from petitioner and AUSA Stuckey.[4]

## II. Discussion

A prisoner may seek relief under 28 U.S.C. § 2255, based on a denial of his or her Sixth Amendment right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) counsel's performance was deficient (*i.e.*, counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"); and (2) the deficient performance prejudiced the petitioner (*i.e.*, "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). Id. at 687-690.

### A. Applicability of the Sixth Amendment

The government argues that petitioner cannot premise an ineffective assistance of counsel claim on De la Puente's pre-indictment advice because petitioner had no right to counsel in evaluating the government's pre-indictment, six-year plea offer. I disagree.

Although the Supreme Court has not squarely addressed whether a suspect-defendant has the right to the effective assistance of counsel at a formal pre-indictment plea negotiation, courts have recognized that the "Sixth Amendment can apply when the government's conduct occurs pre-indictment." In re Grand Jury Proceedings (Goodman), 33 F.3d 1060, 1062 (9th Cir. 1994) (emphasis in original); see also Roberts v. Maine, 48 F.3d 1287, 1291 (1st Cir. 1995) ("We

---

continued to cooperate in the government's investigation; and (2) in August 2002, the government offered a plea bargain that would have resulted in a Sentencing Guideline Range of 188 to 235 months imprisonment. See Government's Hr'g Br., at 3 n.1 (doc. 399); Def.'s Br. Concerning Evidentiary Hr'g, at 2 (doc. 378).

[4]Due to Judge Haggerty's illness, I presided over the evidentiary hearing.

recognize the possibility that the right to counsel might conceivably attach before any formal charges are made, or before an indictment or arraignment, in circumstances where the government had crossed the constitutionally significant divide from fact-finder to adversary.") (citations omitted); United States ex rel. Hall v. Lane, 804 F.2d 79, 82 (7th Cir. 1986) (recognizing that the Sixth Amendment right to counsel may attach "prior to the initiation of formal adversary proceedings"). The reasoning behind the cases makes clear that the right to the effective assistance of counsel rests on the nature of the confrontation between the suspect-defendant and the government, rather than a "mechanical" inquiry into whether the government has formally obtained an indictment. See Paterson v. Illinois, 487 U.S. 285, 298 (1988) (defining "the scope of the right to counsel by a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel."); see also Nunes v. Mueller, 350 F.3d 1045, 1054 n.6 (quoting Strickland, 466 U.S. at 695) (recognizing "Strickland's discouragement of 'mechanical rules' that distract from an inquiry into the fundamental fairness of the proceedings").

The "core purpose" of the Sixth Amendment right to counsel is to guarantee effective assistance at trial. United States v. Ash, 413 U.S. 300, 309 (1973). The Sixth Amendment, hoever, guarantees more than simply a right to a fair trial. United States v. Blaylock, 20 F.3d 1458, 1466 (9th Cir. 1994). It "serves to protect the reliability of the entire trial process." Nunes, 350 F.3d at 1052. For this reason, the right to effective counsel has been extended to certain pretrial proceedings that "might appropriately be considered parts of the trial itself," such as where the defendant is "confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." Ash, 413 U.S. at 310. There are often "critical confrontations of the

PAGE 6 - OPINION AND ORDER

accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality." United States v. Wade, 388 U.S. 218, 224 (1967).  Accordingly, the right to the effective assistance of counsel extends to "all critical stages of the criminal process." Nunes, 350 F.3d at 1052.

A "critical stage" is any "trial-like confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice." United States v. Leonti, 326 F.3d 1111, 1117 (9th Cir. 2003).  It includes all circumstances in which "certain rights might be sacrificed or lost," or where "[a]vailable defenses may be irretrievably lost." Wade, 388 U.S. at 225.  The essence of a critical stage is "not its formal resemblance to a trial but the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel." Leonti, 326 F.3d at 1117. In determining whether the right to counsel applies, "the test utilized by the Court has called for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." Ash, 413 U.S. at 313.  Courts look to whether the prosecution "has committed itself to prosecute," and whether the "adverse positions of the government and defendant have solidified," such that the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." Kirby v. Illinois, 406 U.S. 682, 689 (1972).

The adversarial nature of the August 2001 plea negotiation, combined with the possibility that petitioner's right to trial might be sacrificed or lost, makes clear that it was a critical stage of the criminal process.  The AUSA facilitated the appointment of counsel for petitioner for a formal plea negotiation, told petitioner he would be indicted, and then presented petitioner with a

specific plea bargain that, if accepted, would have required him to surrender his constitutional right to trial, and serve six years in prison. This is proof that the government made a commitment to prosecution, and that the parties' adverse positions had solidified in much the same way as when formal charges are filed. This was not a casual conversation, but a formal negotiation. The AUSA made clear that petitioner was facing "serious charges" that would "undoubtedly expose him to a lengthy sentence," and then offered a specific term of imprisonment in exchange for petitioner's continued cooperation. First Aff. of AUSA Stuckey, ¶ 6. Under these specific circumstances, the August 2001 plea negotiation was the functional equivalent of the initiation of formal adversarial proceedings against petitioner. Accordingly, petitioner was entitled to the effective assistance of counsel.

The government believed petitioner had the right to the assistance of counsel in meeting his prosecutorial adversary, and deciding whether to plead guilty. Indeed, the AUSA insisted petitioner obtain an attorney before any plea negotiation, and sought the appointment of counsel for petitioner because he was "in need of appointed counsel." Def.'s Ex. 203; Tr. 106:5-7; Def.'s Ex. 203; see also Tr. 85:19-20 ("I will not meet with him until he has a lawyer"). The AUSA testified that it would be "unfair" to meet with petitioner without counsel, and the meeting would be more efficient with counsel because "[y]ou don't have to explain everything [in] quite as much detail." Tr. 86:3-12. In other words, the government relied on De la Puente to assist petitioner in meeting his adversary, and navigating his way through the "intricacies of substantive and procedural criminal law." Kirby, 406 U.S. at 689. The government cannot now contend petitioner had no right to counsel in the first place.

Judge Jelderks' appointment of counsel pursuant to the Criminal Justice Act, to "defend

PAGE 8 - OPINION AND ORDER

[petitioner] in connection with the [alleged] drug trafficking crimes," Gov.'s Am. Ex. 1, is

further evidence that the government committed itself to prosecution at the August 2001 plea

negotiation, and that petitioner was entitled to the effective assistance of counsel. The Criminal

Justice Act, 18 U.S.C. § 3006A, specifically provides for adequate representation for

"defendants" who are charged with a crime, or entitled to representation under the Sixth

Amendment. Courts appoint counsel under the Criminal Justice Act to persons in need of legal

assistance. To conclude that petitioner was not entitled to "effective" assistance of counsel

would make a mockery of the judicial appointment of counsel.

      The August 2001 plea negotiation was a formal adversarial proceeding, at which

"potential substantial prejudice to the defendant's rights inheres and in which counsel may help

avoid that prejudice." Leonti, 326 F.3d at 1117. Accordingly, it was a critical stage of the

criminal process in this case and petitioner was entitled to the effective assistance of counsel in

deciding whether to plead guilty and continue to cooperate. Id. (holding that defendant was

"entitled to the effective assistance of counsel in his decision whether and when to plead guilty,"

and recognizing that "attempted cooperation [is] a critical stage of the proceeding"); see also

United States v. Busse, 814 F. Supp. 760, 763 (E.D. Wis. 1993) (recognizing ineffective

assistance of counsel claims arising from pre-indictment plea negotiations); Chrisco v. Shafran,

507 F. Supp. 1312, 1319-20 (D. Del. 1981) (same); cf. Nunes, 350 F.3d at 1053 (a defendant is

entitled to effective assistance of counsel at "all critical stages of a criminal prosecution, which

must include the plea bargaining process"); United States v. Fuller, 941 F.2d 993, 995 (9th Cir.

1991) ("[A] defendant has the right to assistance of counsel in deciding whether or not to plead

guilty"); United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992) ("[T]he plea bargaining stage was

PAGE 9 - OPINION AND ORDER

a critical stage at which the right to effective assistance of counsel attaches . . . ."); United States ex rel. Caruso v. Zelinsky, 689 F.2d 435, 438 (3d Cir. 1982) ("[T]he decision to reject a plea bargain offer and plead not guilty is also a vitally important decision and a critical stage at which the right to effective assistance of counsel attaches.").

   To conclude that petitioner had no right to counsel in evaluating the government's plea offer simply because the government had not yet obtained a formal indictment would elevate form over substance, and undermine the reliability of the pre-indictment plea negotiation process. It would "raise[] the specter of the unwary defendant agreeing to surrender his right to trial in exchange for an unfair sentence without the assurance of legal assistance to protect him." United States v. Moody, 206 F.3d 609, 615 (6th Cir. 2007). Most federal criminal cases are resolved through plea negotiations and a suspect-defendant's best chance of obtaining a reduced sentence occurs prior to indictment. Depriving a suspect-defendant of the effective assistance of counsel at pre-indictment plea negotiation like the August 2001 meeting may be more damaging than a denial of effective assistance at trial itself. Maine v. Moulton, 474 U.S. 159, 170 (1985). Indeed, as a result of De la Puente's grossly inadequate advice during plea negotiations, petitioner rejected the government's six-year offer, and went to trial believing that he was facing between 30 and 80 months in prison. In fact, he was facing twenty years. Because the August 2001 plea negotiation was a "critical stage of the criminal process," petitioner was entitled to the effective assistance of counsel in evaluating the government's six-year offer despite the absence of a formal indictment.[5]

─────────────────

   [5]The government did not cite United States v. Moody, 206 F.3d 609 (6th Cir. 2007). There, the Sixth Circuit reluctantly held that a suspect-defendant has no right to the effective assistance of counsel at a pre-indictment plea negotiation, even though there was "no question . .

PAGE 10 - OPINION AND ORDER

## B. Sufficiency of Legal Advice

A defendant has a constitutional right to effective assistance of counsel during plea negotiations. Hill v. Lockhart, 474 U.S. 52, 58-59 (1985). The failure to properly advise a defendant of available options, and possible consequences relevant to plea negotiations can constitute ineffective assistance of counsel. Blaylock, 20 F.3d at 1465. An attorney's performance is deemed deficient when he or she provides advice that is "so incorrect and so insufficient that it undermined [the defendant's] ability to make an intelligent decision about whether to accept the [plea] offer." Turner v. Calderon, 281 F.3d 851, 880 (9th Cir. 2002). "Where the issue is whether to advise the client to plead or not 'the attorney has the duty to advise the defendant of the available options and possible consequences' and the failure to do so constitutes ineffective assistance of counsel" Blaylock, 20 F.3d at 1465; see also Day, 969 F.2d at 43 (information regarding the difference between the sentence exposure under a proposed plea

---

. that at formal plea negotiations, where a specific sentence is offered to an offender for a specific offense, the adverse positions of the government and the suspect have solidified." Id. at 615-16. I decline to follow Moody because it is neither binding, nor particularly persuasive. Indeed, the Sixth Circuit acknowledged that its holding was contrary to "logic, justice, and fundamental fairness," id. at 613, and that pre-indictment plea negotiations are a "critical stage." Id. at 615.

The government also overlooked United States v. Hayes, 231 F.3d 663 (9th Cir. 2000), in which the Ninth Circuit appears to establish a bright line rule that the Sixth Amendment does not attach prior to indictment. Hayes involved the applicability of the Sixth Amendment during surreptitiously recorded, pre-indictment conversation with a suspect-defendant. Central to the Ninth Circuit's holding was the fact that at the time of the interview, "the government remained an investigator rather than a prosecutor." Id. at 673. In contrast, the government crossed the constitutionally significant divide from investigator to prosecutor in this case when the AUSA facilitated the court appointment of counsel to represent petitioner at a formal plea negotiation, informed petitioner that he would be indicted, and then offered a specific plea bargain that would have required petitioner to forfeit his right to a jury trial and serve six years in prison. Even if Hayes and Moody preclude petitioner's claim regarding De la Puente's pre-indictment representation, I find that De la Puente's post-indictment representation was so deficient that it undermined the reliability of the entire plea negotiation process.

PAGE 11 - OPINION AND ORDER

agreement and the sentence exposure if the plea is rejected is "crucial to the decision whether to plead guilty."); Boria v. Keane, 99 F.3d 492, 498 (2d Cir. 1996) (when a lawyer fails to give a client plea advice, that lawyer does not make a strategic decision).

Here, De la Puente provided constitutionally insufficient assistance when he refused to advise petitioner of his available options, and the possible consequences of rejecting the government's six-year offer. Blaylock, 20 F.3d at 1465. Before the August 2001 plea offer expired, De la Puente was aware of a substantial information that should have alerted him to the potential for a sentence substantially longer than six years. He knew that petitioner had confessed to handling at least 100,000 ecstacy pills, cooperated with the government for three weeks, and was involved in the delivery of at least three international shipments of ecstacy pills worth approximately $75,000. Gov. Am. Exh. 4; Tr. 17:5-14; Tr. 70:18-21. He knew that agents found 116 ecstacy pills, a pistol-grip shotgun, a scale, and drug-packaging material in his home. Despite this overwhelming evidence of petitioner's involvement in a conspiracy to import and distribute thousands of ecstacy pills, De la Puente failed to explain to petitioner that he could be held liable for all of the ecstacy imported or distributed during the scope of the conspiracy. He should have explained that petitioner was facing a sentence substantially longer than six years, and that acquittal was unlikely in light of the government's evidence and his detailed confession.

De la Puente actually provided petitioner with inaccurate advice regarding his potential sentencing exposure. The day of the plea negotiation, he told petitioner that his sentencing guideline range was 41 to 51 months. Def.'s Ex. 102. This guideline calculation was based on an outdated edition of the Sentencing Guidelines. Wilson, 2009 WL 1028088, at *7. The sentencing calculation was so incorrect that it undermined petitioner's ability to make a

PAGE 12 - OPINION AND ORDER

reasonably informed, intelligent decision about whether to accept a 70-month plea agreement.
Turner, 281 F.3d at 881.

These errors were compounded by De la Puente's grossly inadequate advice regarding the
likelihood of obtaining full immunity. A reasonably competent attorney would have explained to
petitioner that it was highly unusual for a defendant to receive full immunity, especially when he
had already confessed involvement in trafficking narcotics and cooperated with the government.
Aff. of Dennis Balske, ¶ 9. De la Puente should have recognized that there was no objective
evidence of an informal immunity agreement, and that an immunity/public authority defense
would be unsuccessful. See Wilson, 392 F.3d at 1060 (noting petitioner's statements
"demonstrate he knew no one had granted" immunity, and "whatever [petitioner] may have
believed he would be granted, the statements to which [he] points do not objectively reflect
words of offer"). Even if petitioner honestly believed the agents promised "full immunity," De la
Puente should have recognized, and explained to petitioner, that law enforcement agents are not
generally authorized to bind the U.S. Attorney to an immunity agreement. United States v.
Cordova-Perez, 65 F.3d 1552, 1554 (9th Cir. 1995). Given the absence of any actual promise of
immunity and petitioner's detailed confession and cooperation, it was unreasonable for De la
Puente to fail to explain that full immunity was extremely unlikely.

When the AUSA unequivocally rejected any deal involving complete immunity on
August 31, 2001, De la Puente should have finally realized, and explained to petitioner, that full
immunity was not a possibility. See Gov. Am. Ex. 2 ("Your letter of this morning rejects any
pre-indictment resolution of [petitioner's] criminal conduct short of complete immunity. That is
something I will not do."). Yet, there is no evidence that De la Puente communicated that to

PAGE 13 - OPINION AND ORDER

petitioner <u>before</u> the six-year offer expired.  Instead, De la Puente rejected the six-year offer

without petitioner's knowledge.  Gov. Am. Ex. 3 ("You correctly read my letter of this morning

as a rejection."); <u>see</u> Tr. 19:11-13 ("Q: You are saying that you did not know about the

Government's counter to that first letter?  A: Not that day, no."); Tr. 19:25-20:2 ("Q: Did you

know—at the time he sent it, did you know he was sending [the second] letter?  A: No."); Tr.

20:10-17 ("Q: You weren't aware that your attorney had effectively rejected the six-year offer

that the Government had extended to you the day before?  A: That we completely rejected it?  Q:

Yes.  A: No.  When I left there, I thought this [the plea negotiation] was just going to continue

on.").  This information would have been critical to making an informed decision about whether

to accept the government's plea offer.  De la Puente's failure to inform petitioner that the AUSA

rejected any "full immunity" deal was "neither reasonable nor the result of sound trial strategy."

<u>Murtishaw v. Woodford</u>, 255 F.3d 926, 939 (9th Cir. 2001).

By failing to advise petitioner of the strength of the government's case, misleading

petitioner regarding his potential sentence, and failing to advise petitioner as to the improbability

of obtaining full immunity, De la Puente failed to provide petitioner with information necessary

to making a reasonably informed, intelligent decision about whether to accept the government's

six-year offer.  <u>Turner</u>, 281 F.3d at 880.  De la Puente's deficient advice regarding the

government's six-year offer fell below an objective standard of reasonableness, and deprived

petitioner of constitutionally effective assistance.

Even if petitioner had no right to the effective assistance of counsel at the August 2001

plea negotiations (as the government contends), De la Puente's <u>post-indictment</u> advice was so

incorrect that it undermined petitioner's ability to make an intelligent decision about whether to

PAGE 14 - OPINION AND ORDER

pursue a plea bargain, or take his chances by going to trial. By the time petitioner was indicted

on nine counts of conspiracy, possession, distribution, and importation of approximately 100,000

ecstacy pills, De la Puente should have finally recognized that petitioner was facing a much

longer sentence than six years. He should have recommended that petitioner aggressively pursue

a plea agreement comparable to the six-year offer. Yet, there is no evidence of either.

When De la Puente did pursue plea negotiations (more than two months after petitioner's

indictment), he continued to press for full immunity even though the AUSA had emphatically

rejected such a deal. See Gov. Am. Ex. 9 (AUSA Stuckey's November 21, 2001 letter reiterating

his position that the notion of full immunity was "wholly unreasonable" and "simply

unrealistic."); see also Tr. 97:12-16 ("I found it surprising [that De la Puente continued to press

for immunity] when viewed in the context of all my letters. I kept saying that's unreasonable,

totally unacceptable . . . it never was going to happen."). There is no evidence that De la Puente

ever advised petitioner that full immunity was improbable. In fact, he advised petitioner to

remain adamant that he had a deal with the agents, and that he was entitled to immunity. Tr. 27-

28. When petitioner told De la Puente that he felt like giving up on immunity, De la Puente

encouraged him to continue fighting, and compared his pursuit of immunity to African-

Americans' struggle for civil rights. Def.'s Ex. 104. He told petitioner that there was "no

question . . . that you entered an agreement with the government, notwithstanding its tacit nature.

You declared you intention not to proceed unless with full immunity. Through its conduct, the

government accepted your additional terms which caused a novation of the agreement. Through

his conduct, the prosecutor ratified the agreement. The record is clear on the facts." Def.'s Ex.

104. In light of the agents' recorded statements to petitioner and the AUSA's repeated rejection

PAGE 15 - OPINION AND ORDER

of any deal involving immunity, De la Puente's advice was fundamentally wrong.  Ordinary

contract principles govern informal immunity agreements and here, there was no objective

evidence of an offer, or a meeting of the minds.  De la Puente's failure to inform petitioner of the

AUSA's position on immunity, and his encouragement of the pursuit of full immunity was

"neither reasonable nor the result of sound trial strategy."  Murtishaw, 255 F.3d at 939.

Finally, there is no evidence that De la Puente ever provided petitioner with an accurate

assessment of his potential sentencing exposure.  See First Aff. of J. Wilson, ¶¶ 9-10 ("He never

told me I was looking at the possibility of 20 years."); Gov. Ex. 1 to Supplemental Mem. ("To

find that they now want a level 40, and I'm looking at 20 years, is beyond anything I could have

imagined.").  In fact, De la Puente repeatedly provided petitioner with inaccurate sentencing

guideline calculations.  Wilson, 2009 WL 1028088, at *7; see also Def.'s Ex. 102 (sentencing

guideline range of approximately 41 to 51 months in prison); Def.'s Ex. 103 (sentencing

guideline calculation of approximately 30 to 41 months imprisonment); Def.'s Ex. 104

(sentencing guideline estimate of 42 to 80 months in prison, depending on whether petitioner

obtained a departure for acceptance of responsibility); First Aff. of Wilson, ¶ 9 ("I think he said

somewhere between 12 and 18 months or 41 and 51 months"); see also Gov. Ex. 3 to

Supplemental Mem. (post-conviction guideline calculation of 57 to 108).  These miscalculations

stemmed from De la Puente's reliance on an outdated version of the Sentencing Guidelines, his

misunderstanding of the applicability of the "safety valve" departure, and his mistaken belief that

petitioner would be entitled to a reduction for acceptance of responsibility even if he proceeded

to trial.  See Def.'s Exh. 103 (stating that "the 2000 version of the Guidelines applies" and

including safety valve departure); Def.'s Ex. 104 (stating, "you can decide to just go to trial,

PAGE 16 - OPINION AND ORDER

you'll still get three levels off your sentence for acceptance of responsibility"); Gov. Ex. 4 to Supplemental Mem. (doc. 369), at 2 ("I believed that if found guilty, you would get three levels off the base offense level for acceptance of responsibility"); First Aff. of Wilson ¶ 9 (He "never told me that these [departures] were at the judge's discretion only. He made it sound like I was entitled to them."). De la Puente also failed to consider the two-level firearm enhancement under U.S.S.G. § 2D1.1(b)(1), which increased petitioner's sentencing range by 30 months. Def.'s Ex. 103, 104.

De la Puente led petitioner to believe that he had a good immunity claim and that if he was convicted at trial, he would serve between 30 and 80 months, at worst. In fact, petitioner had very little chance of prevailing on his "immunity/public authority" claim, and was facing 20 years in prison. De la Puente's advice regarding petitioner's sentencing exposure and the likelihood of immunity was "so incorrect and so insufficient that it undermined" petitioner's ability to make a reasonably informed, intelligent decision about whether to accept a plea agreement, or take his chances by going to trial. Turner, 281 F.3d at 880.

**C. Prejudice**

Petitioner must demonstrate he was prejudiced by trial counsel's deficient performance. Prejudice results if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In the context of plea negotiations, the inquiry is whether there is a "reasonable probability" that "but for counsel's bad advice the outcome of plea bargaining would have been different." Perez v. Rosario, 459 F.3d 943, 948 (9th Cir. 2006) (citing Hill, 474 U.S. at 56-59); see also

PAGE 17 - OPINION AND ORDER

Nunes, 350 F.3d at 1054 (Where trial counsel gave petitioner "wrong information and advice" about the plea offer, petitioner "needed only to demonstrate that he had sufficient evidence for a reasonable fact finder to conclude with 'reasonable probability' that he would have accepted the plea offer."). It "does not require certainty or even a preponderance of the evidence," but only a "reasonable probability" that the result would be different. Day, 969 F.2d at 45 n.8.

I have heard petitioner's testimony, and had the opportunity to evaluate his credibility. I accept his testimony that he would have accepted the government's six-year plea offer had his attorney provided him with accurate advice regarding his sentence, the strength of the government's case, and the improbability of obtaining immunity. From the moment petitioner was arrested, he was cooperative. He knew he was guilty, and he never expected to go to trial. He had already confessed to handling hundreds of thousands of pills. Tr. 21-22; First Aff. of Wilson, ¶ 3. I accept petitioner's statement that he would have accepted the six-year offer if he had known that he was facing 20 years in prison, and that immunity was not a viable option. Tr. 21:13-17 ("I know I was guilty, and I know I was going to be found guilty. . . I told them everything. I had confessed to everything. I was going to be found guilty. Why would I go to trial to get 20 years when I could have accepted a six-year offer? I had no clue what federal charges were and how serious it could be."); see also Second Aff. of Jay Wilson, ¶ 9 ("If I had known that I could get 20 years, I would have taken the first offer of 70 months. I would not have gone to trial on this case. Why would I go to trial when I had already confessed to the police?"); Tr. 32:12-15.

Petitioner's age and the great disparity between the 20-year sentence and the initial six-year offer validates petitioner's assertion that he would have taken the six-year plea offer. See

PAGE 18 - OPINION AND ORDER

United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998) ("[T]hat there is a great disparity

between the actual maximum sentencing exposure . . . and the sentence exposure represented by

defendant's attorney provides sufficient objective evidence to establish a reasonable probability

that the outcome of the proceeding would differ.") (quotations omitted).  A fifty-five year old

man "would think twice before risking over [5,000] extra days in jail just to gain the chance of

acquittal of a crime that he knew that he had committed." Day, 969 F.2d at 43, 45 (concluding

that defendant's contention that he would have accepted a five-year deal if he knew he was

facing 22 years rather than 11 years was not implausible).  But for De la Puente's grossly

inaccurate advice regarding petitioner's sentence and his failure to inform petitioner that the

AUSA unequivocally rejected "complete immunity," there is a reasonable probability that

petitioner would have accepted the government's six-year offer.

I am not persuaded by the government's arguments that petitioner would not have

accepted any offer.  Although petitioner initially stated that he "could not do six years" at the

August 2001 plea negotiation, he explained that "any 56 year old man told he is going to prison

for six years, the first thought in his mind is I can't do six years." Tr. 10:25-11:2.  More

importantly, there is no evidence that petitioner knew that he was facing a potential twenty-year

sentence when he made that statement.  The government also pointed to petitioner's statement

that he "could not and would not do six years" at the hearing on the motion to dismiss.  Again,

there is no evidence that petitioner knew that he was facing a potential twenty-year sentence

when he made that statement.  Those statements must also be viewed in the context of De la

Puente's advice regarding petitioner's sentence and the likelihood of obtaining immunity.

Following the June 5, 2002 hearing, De la Puente again provided petitioner with an erroneous

PAGE 19 - OPINION AND ORDER

sentencing guideline calculation of 30 to 80 months in prison. Def.'s Ex. 104.  He also continued

to assure petitioner that there was "no question" he had an enforceable immunity agreement. Id.

Petitioner's statements illustrate the prejudicial effect of De la Puente's grossly erroneous advice.

Why would anyone accept a 70-month plea offer when their attorney had advised them that they

were entitled to immunity, and that even if they were convicted at trial, they likely would receive

less than 70 months in prison, but no more than 80?

That petitioner surreptitiously tape recorded conversations with case agents prior to the

August 2001 plea negotiations has little bearing on whether he was prejudiced by De la Puente's

subsequent inadequate advice.  It is not clear that petitioner planned to use the tapes to obtain

immunity.  In any event, it was De la Puente's job to explain to petitioner that the tapes

undermined his immunity claim.  They contain no evidence of any immunity promise.

Petitioner's post-verdict communications with De la Puente do not help the government.

Petitioner's failure to express regret in not accepting the six-year offer is not proof of anything.

His failure to object in writing to certain assertions made by De la Puente does not prove that he

agreed with De la Puente.  Petitioner's post-conviction letters actually contain support for his

assertion that De la Puente failed to accurately advise him of his potential sentencing exposure

prior to trial.  See Gov. Ex. 1 to Supplemental Mem. ("To find that they now want a level 40, and

I'm looking at 20 years, is beyond anything I could have imagined."); Gov. Ex. 3 to

Supplemental Mem. ("You . . . tell me you think it will fall in the 57 to 108 month range! You

looked at me as if I should be pleased with this.  Nine years!).  Petitioner's letters also support

the conclusion that but for De la Puente's inadequate advice, petitioner would have accepted the

six-year offer.  Gov. Ex. 5 to Supplemental Mem. ("Without a lawyer, I would have served 4-6

PAGE 20 - OPINION AND ORDER

years, without any help[.] With your help, I'm serving twenty.").

I find De la Puente's post-conviction summary letters to be unreliable. On February 3, 2003, the AUSA wrote to De la Puente regarding his "attempt[] to summarize a phone conversation" between the two attorneys. Def.'s Ex. C (doc. 373). The AUSA wrote that De la Puente's "selective use of quotes, taken out of context, leaves a distorted view of that conversation," and concluded "[i]n view of this, I feel it necessary to request that communications between ourselves be by letter and not by telephone. Sadly, in 24 years of practicing law, I have never felt it necessary to make such a request." Id. This letter certainly casts doubt on the veracity of De la Puente's subsequent letters to petitioner, which purport to summarize petitioner's statements regarding plea negotiations.

De la Puente's affidavit is not credible. He acknowledged that his recollection of petitioner's case "is fading," Aff. of F. de la Puente, ¶ 6, and portions of his affidavit are contradicted by evidence in the record. He denies advising petitioner that he was eligible for a "safety valve" departure, id. ¶ 7, but his written sentencing guideline calculations included that departure and omitted any consideration of the applicable two-level firearm enhancement. Ex. 103, 104. De la Puente also denies advising petitioner that he would be entitled to a three-level departure for acceptance of responsibility, id., but on July 16, 2002, he told petitioner that he could "go to trial, [and] still get three levels off [his] sentence for acceptance of responsibility." Def.'s Ex. 104. The overwhelming evidence is that De la Puente failed to provide petitioner with an accurate assessment of his sentencing exposure.

I find that De la Puente's advice throughout the pretrial plea negotiation process was "so incorrect and so insufficient that it undermined [petitioner's] ability to make an intelligent

decision about whether to accept the [six-year plea] offer." Turner, 281 F.3d at 880.  I also find

that there is a reasonable probability that but for trial counsel's bad advice, petitioner would have

accepted the government's six-year plea offer, or any comparable offer.  Perez, 459 F.3d at 948.

Accordingly, petitioner has satisfied both prongs of the test articulated in Strickland v.

Washington, 466 U.S. 668 (1984), and I find that he was deprived of the effective assistance of

counsel throughout the plea bargaining process.

### D. Remedy

"Once a determination has been made that habeas relief is warranted, the district court has

"considerable discretion in fashioning a remedy 'tailored to the injury suffered from the

constitutional violation . . . .'"  Riggs v. Fairman, 399 F.3d 1179, 1184 (9th Cir. 2005) (quoting

United States v. Morrison, 449 U.S. 361, 364 (1981)); see also 28 U.S.C. § 2255 (If the court

finds a denial or infringement of the prisoner's constitutional, "the court shall vacate and set the

judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct

the sentence as may appear appropriate.").  The "remedy for counsel's ineffective assistance

should put the defendant back in the position he would have been in if the Sixth Amendment

violation had not occurred."  Blaylock, 20 F.3d at 1468.  "When ineffective assistance of counsel

has deprived defendant of a plea bargain, a court may choose to vacate the conviction and return

the parties to the plea bargaining stage."  Riggs, 399 F.3d at 1184.  "A court may also order the

government to reinstate its original plea offer to the defendant or release the defendant within a

reasonable amount of time."  Id.  In choosing the proper remedy, "a court must consider the

unique facts and circumstances of the particular case."  Id.

I find that the only reasonable remedy for De la Puente's constitutionally ineffective

pretrial advice is the specific performance of the government's initial six-year plea offer. There is a reasonable probability that petitioner would have accepted the government's six-year offer had De la Puente adequately advised him about his likely sentencing exposure, the strength of the government's case, and the improbability of obtaining immunity in light of his detailed confession and the AUSA's unequivocal rejection of complete immunity. Petitioner's rejection of the six-year offer was the product of trial counsel's constitutionally inadequate advice. Specific performance of the six-year offer is the only way to put petitioner back in the position he would have been in had the violation never occurred. Blaylock, 20 F.3d at 1468.

Even if the six-year offer expired before petitioner's Sixth Amendment right to counsel attached (as the government contends), I find that immediate release is the only remedy available for trial counsel's ineffective post-indictment assistance. By the time petitioner was indicted, De la Puente should have recognized that he was facing a sentence substantially longer than six years. He should have recommended that petitioner aggressively pursue a plea agreement comparable to the six-year offer, but he does not recall making any such effort. Moreover, there is no evidence that De la Puente ever provided petitioner with an accurate assessment of his potential sentencing liability, or the improbability of full immunity. In fact, he repeatedly advised petitioner that he was only facing between 30 to 80 months in prison, when he was facing twenty years. He continued to encourage petitioner to pursue immunity even though the AUSA repeatedly and unequivocally rejected any full immunity deal. De la Puente's grossly erroneous pre-trial advice deprived petitioner of information necessary to making an intelligent decision about whether to pursue a plea agreement.

I cannot say with absolute certainty what agreement the parties would have made, had De

PAGE 23 - OPINION AND ORDER

la Puente provided petitioner with accurate advice.  There is evidence, however, that petitioner could have obtained a post-indictment offer that was roughly comparable to the government's six-year offer.  The AUSA testified that if De la Puente had asked, he would have given petitioner more time to consider the six-year offer.  Tr. 93:15-21.  This suggests that a comparable plea agreement was still a possibility one week later, when petitioner was indicted. On November 21, 2001, the AUSA expressed continued willingness to engage in meaningful settlement discussions.  If De la Puente had properly explained the purpose of a proffer session and advised petitioner that full immunity was unrealistic, those discussions could have resulted in a plea settlement.  Additionally, co-defendant Andre Wegner, who was charged with nearly identical crimes, reached a plea agreement with the government that resulted in his January 2007 release from prison.  Petitioner could have obtained a comparable plea offer if his attorney had aggressively pursued it in the weeks following the indictment.

Petitioner's cooperation in this case also supports reinstating the six-year offer.  The government acknowledged that it was "appreciative" of petitioner's cooperation, Gov. Am. Ex. 4, and that his continued cooperation would have been "valuable."  Tr. 89:17-18.  But for De la Puente's inadequate advice, petitioner likely would have continued to cooperate, and would be out of prison today.

Immediate release is appropriate.  There is nothing else the court can do to put petitioner back in the position he would have been in, except for De la Puente's grossly ineffective assistance.  Returning the parties to the negotiating table is not a viable option.  Petitioner's cooperation is not of value because the government has already prosecuted and convicted the participants in the conspiracy.

PAGE 24 - OPINION AND ORDER

The government argues that because the six-year offer expired before petitioner's right to counsel attached, the only remedy available is to re-extend the eve-of-trial, 188 to 235-month plea offer. Even if petitioner had no right to counsel at the August 2001 plea negotiation, the 188 to 235-month offer does not put him back in the position he would have been in, but for trial counsel's ineffective <u>post-indictment</u> assistance. The Sixth Amendment mandates that the government bear the risk of constitutionally deficient assistance of counsel. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 379 (1986). The government's suggested remedy would impermissibly shift the risk of ineffective assistance of counsel from the government to petitioner. De la Puente's fundamentally flawed post-indictment advice deprived petitioner of the opportunity to pursue a plea agreement roughly comparable to the government's initial six-year offer. Under these specific circumstances, the only meaningful remedy for trial counsel's grossly ineffective assistance is the specific performance of the government's six-year offer.[6]

Finally, I find that a six-year term of imprisonment is "reasonable" and "sufficient but not greater than necessary" to comply with the sentencing goals of 18 U.S.C. § 3553(a). It provides for punishment, deterrence, protection of the public, and petitioner's rehabilitation. Petitioner is now 64 years old and suffers from numerous health problems. He has a low risk of recidivism.

---

[6] The government also suggests that reinstating the six-year offer is inappropriate because petitioner allegedly provided ecstasy to, and sexually assaulted, underage girls. Petitioner was never charged with, or convicted of, those crimes. In the absence of a conviction, enhancing petitioner's sentence would run afoul of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and its progeny. Additionally, I am not persuaded that these allegations would have rendered petitioner useless as a witness. Even if the allegations were admissible at trial (which I doubt), it is not clear how they would be relevant to petitioner's credibility.

PAGE 25 - OPINION AND ORDER

All but one of petitioner's co-conspirators served similar or reduced sentences.[7] Thus, a six-year sentence will reduce this unwanted disparity in sentencing.

Petitioner has now served seven years in prison. He has completed the sentence that he would have received under the government's initial plea offer. Unconditional discharge from custody is the only remedy available to put him back in the position he would have been in, but for De la Puente's grossly ineffective assistance.

### III. Conclusion

For the reasons set forth above, I GRANT petitioner's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (doc. 285). The government shall release defendant within 30 days, and credit his term of supervised release for the additional time (beyond the six years) he was incarcerated.

IT IS SO ORDERED.

DATED this _1st_ day of March, 2010.

James A. Redden
United States District Judge

---

[7]Mr. Gentry, the recipient of the first intercepted package containing 38,509 ecstacy pills, was sentenced to 12 months and a day in prison. Co-conspirator Graber received a twenty-month sentence. Co-defendant Wegner, who was also charged with multiple counts of conspiracy and importation, distribution, and possession of over one hundred thousand ecstacy pills, plead guilty pursuant to an agreement and has been out of custody since 2007. Mr. Fischer, the undisputed leader and source of supply for the conspiracy, was sentenced to 235 months in prison.

PAGE 26 - OPINION AND ORDER